**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

John Paul Vicente, et al.,

               Plaintiffs,

v.

Prescott, City of, et al.,

               Defendants.

No. CV-11-08204-PCT-DGC

**AMENDED ORDER**

    Defendants have filed a motion for summary judgment. Doc. 204. The motion is fully briefed. The Court will grant the motion in part and deny it in part.

    Plaintiffs have also filed a motion for partial summary judgment for "failure to preserve and produce ESI."[1] Doc. 208. Defendants have responded and filed a cross-motion for sanctions. Doc. 216. Plaintiffs have also filed a motion to compel disclosure of unredacted documents. Doc. 244. Also pending are a motion to strike (Doc. 236), a motion to amend Plaintiffs' statement of facts in support of their motion for partial summary judgment (Doc. 242), and a motion to amend/correct Plaintiffs' reply to their motion for partial summary judgment (Doc. 243). The Court will deny the motions for sanctions, grant the motion to compel, and deny the remaining motions as moot. The

---

[1] Plaintiffs' briefing fails to comply with Local Rule 7.1(b)(1). Specifically, footnotes in the briefs are in micro-print, lengthy, and very difficult to read. This appears to be a clear end-run around the Court's page limits. *See, e.g.*, Doc. 213 at 14. The Court considered disregarding all footnotes, but did not do so because Plaintiffs placed all of their legal citations there. In all future filings, Plaintiffs shall comply with the local rules and shall put citations for assertions in the text in the text, not in the footnotes.

1   requests for oral argument are denied because the issues have been fully briefed and oral

2   argument will not aid the Court's decision.  *See* Fed. R. Civ. P. 78(b); *Partridge v. Reich*,

3   141 F.3d 920, 926 (9th Cir. 1998).

4   **I.    Background.**

5          Plaintiffs in this case are JP Vincente and Shawn Vincente, husband and wife.  JP

6   Vincente, who will be referred to in this order as "Vincente," is a Fire Captain and Acting

7   Battalion Chief with the City of Prescott's Fire Department, where he has worked

8   since 1994.  Doc. 204 at 2.  There are six defendants.  Defendant City of Prescott (the

9   "City") is a municipal corporation.  Doc. 205 at 2.  Defendant Prescott Fire and Police

10  Board of the Public Safety Personnel Retirement System (the "Board") is the entity

11  responsible for administration of the City's Deferred Option Retirement Plan ("DROP").

12  *Id.*   Defendant Bruce Martinez was the Fire Chief for the City until he retired in

13  May 2012.  *Id.*  Defendant Mary Jacobsen is the City's Human Resources Director.  *Id.*

14  at 2-3.  Defendant Steve Norwood was the City Manager until January 14, 2011.  *Id.* at 3.

15  Defendant Laurie Hadley was Assistant City Manager between 2007 and April 2011, and

16  interim city manager from January 14, 2011 to April 12, 2011.

17         In addition to his duties as a Fire Captain and Acting Battalion Chief, Vincente is a

18  member of the United Yavapai Firefighters Local 3066 (the "Union").  Doc. 204 at 2-3.

19  Vincente also owns and operates a business that offers guided hunting trips and another

20  that does landscaping.  During the early 2000s, Vincente frequently traded shifts with

21  other firefighters in order to accommodate the demands of his other businesses.  In some

22  cases Vincente would pay other firefighters in cash for working his shifts rather than

23  working one of their shifts in exchange.  *Id.* at 3.  In 2005, Martinez allegedly told

24  Vincente that he was not to "pay for trades," and Vincente allegedly agreed.  *Id.*

25  Vincente allegedly continued to engage in the practice.  *Id.* at 3.

26         In 2010, Vincente was involved in relaying information to Defendant Martinez

27  about a number of personnel complaints involving Deputy Fire Chief Don Devendorf.

28  *Id.* at 4.  Three firefighters made the complaints – Aaron Laipple, Randy Stazenski, and

Caron Nyquist-Johnson.  *Id.*  Each complaint involved inappropriate comments made by Devendorf to the firefighter in question.  Vincente contends that his communication of these complaints to Fire Chief Martinez was as a union representative.  Defendants contend that Vincente was required by City policy, as a supervisory employee, to report allegations of harassment.  *Id.* at 4-5.

In December 2010, Martinez learned that Vincente was still paying other firefighters to work his shifts and that, in some instances, he had failed to pay the money promised for the work.  *Id.* at 5.  It is unclear how the other Defendants became aware of this information, but Jacobsen, Hadley, and Norwood were all apparently concerned about this conduct.  *Id.* at 5-6.  The City hired "outside legal counsel for advice, to immediately change the shift trade policy, to complete a departmental audit with interviews of all personnel, and to evaluate the potential remedy for deficient contributions to the state retirement system and IRS tax consequences."  *Id.* at 6.  A number of meetings were held in December 2010 and January 2011 to address the situation.  During these meetings, Vincente alleges he was told that his conduct was either illegal or criminal, that Hadley and Martinez were "going after" his job, and that Norwood would attempt to negotiate a retirement option but could not make any guarantees.  Doc. 89, ¶¶ 30-36.  On or about January 5, 2011, Defendants learned that paying for trades was not illegal.  Doc. 214 at 5, ¶ 49.  Around that time, Mrs. Vincente contacted Norwood and asked to meet with him.  Doc. 205, ¶ 204.  During their meeting, which took place on January 7, 2011, Norwood allegedly told Mrs. Vincente that her husband's conduct could be criminal.  *Id.*, ¶ 205.

Ultimately, Defendants prepared a disciplinary agreement to present to Vincente on January 14, 2011.  *Id.*, ¶ 39; Doc. 204 at 7.  The agreement stated that Vincente had violated a previous instruction not to pay others for working his shifts (Doc. 205, ¶ 216), required him to work 19 shifts without compensation, (*id.*, ¶ 217), "would have resulted in Vincente's resignation by June 20, 2011, and [included] the option for Vincente to enter into the DROP" (Doc. 204 at 7).  Vincente did not sign the disciplinary agreement

1  (Doc. 204 at 7), but did enter the DROP program on January 25, 2011 (*id.* at 8).

2  Vincente allegedly re-signed his DROP enrollment paperwork on June 22, 2011, and

3  "made no effort to rescind his DROP membership."  *Id.* at 9.  Vincente remains actively

4  employed by the City's fire department.

5  **II.    Legal Standard.**

6       A party seeking summary judgment "bears the initial responsibility of informing

7  the district court of the basis for its motion, and identifying those portions of [the record]

8  which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex*

9  *Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Summary judgment is appropriate if the

10  evidence, viewed in the light most favorable to the nonmoving party, shows "that there is

11  no genuine dispute as to any material fact and the movant is entitled to judgment as a

12  matter of law."  Fed. R. Civ. P. 56(a).  Only disputes over facts that might affect the

13  outcome of the suit will preclude the entry of summary judgment, and the disputed

14  evidence must be "such that a reasonable jury could return a verdict for the nonmoving

15  party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

16  **III.   Defendants' Motion for Summary Judgment.**

17       **A.    First Amendment Claims.**

18       Plaintiffs' third amended complaint pleads Count I as "Free Speech" under the

19  First and Fourteenth Amendments and Count II as "42 USC § 1983."  Doc. 89 at 12-14.

20  Defendants seek summary judgment on Count I because "[a] litigant complaining of a

21  violation of a constitutional right does not have a direct cause of action under the

22  [Constitution] but must utilize [§ 1983]."  Doc. 204 at 9 (citing *Arpin v. Santa Clara*

23  *Valley Transp. Agency*, 261 F.3d 912, 921 (9th Cir. 2001)).  Plaintiffs do not address this

24  argument in their response.  The Court agrees with Defendants and will enter summary

25  judgment on Count I, but will construe Count II as asserting a § 1983 claim for retaliation

26  in violation of the First Amendment.

27       There are five elements to the retaliation claim: (1) whether Vincente's speech

28  addressed an issue of public concern, (2) whether the speech was spoken as a public

employee or as a private citizen, (3) whether Defendants took adverse employment action and whether Vincente's speech was a substantial or motivating factor in that action, (4) whether Defendants had an adequate justification for treating Vincente differently than members of the general public, and (5) whether Defendants would have reached the same adverse employment decision even in the absence of the protected conduct. *Eng v. Cooley*, 552 F.3d 1062, 1070-72 (9th Cir. 2009).

Defendants argue that they are entitled to qualified immunity on this claim. The "doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Clouthier v. Cnty of Contra Costa*, 591 F.3d 1232, 1240 (9th Cir. 2010). "In considering a claim of qualified immunity, the court must determine 'whether the facts that a plaintiff has alleged . . . make out a violation of a constitutional right," and "whether the right at issue was 'clearly established' at the time of the defendant's alleged misconduct." *Clouthier*, 591 F.3d at 1241 (citing *Pearson v. Callahan*, 555 U.S. 223, 230 (2009)). The first issue to be addressed in a qualified immunity inquiry is whether the facts, taken in the light most favorable to Plaintiffs, show that Defendants' conduct violated a constitutional right. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). If not, the inquiry ends.

Defendants argue that Vincente did not engage in speech on a matter of public concern. Plaintiffs identify two instances in response. First, Plaintiffs identify Vincente's communications with Fire Chief Martinez about the complaints Laipple, Stazenski, and Nyquist-Johnson made regarding Deputy Chief Devendorf. Doc. 213 at 3. Second, Plaintiffs point to an incident in 2004 where Vincente met with Defendant Hadley about a proposed no-confidence vote in Devendorf. *Id.*[2] In *Desrochers v. City of San Bernardino*, 572 F.3d 703 (9th Cir. 2009), the Ninth Circuit explained that plaintiffs

---

[2] Plaintiffs further contend that "Vincente had consistently spoken to others on behalf of the Union regarding perceived concerns with Devendorf's behavior and personality to the extent that such speech likely constituted collective personnel grievances that would qualify as a matter of public concern," *id.*, but cite no evidence in support of this assertion.

bear the burden of showing that their speech addressed an issue of public concern based on "the content, form, and context of a given statement, as revealed by the whole record." *Id.* at 709 (quoting *Connick v. Myers*, 461 U.S. 138, 147 (1983)).   The Court will consider the "content, form, and context" of the two instances of speech identified by Plaintiffs.

Focusing first on Vincente's communication of the complaints against Devendorf, the Court finds that the content of this speech does not suggest that it addressed a matter of public concern.  The Court has not been provided with the precise words Vincente used when speaking with Martinez about the grievances of Laipple, Stazenski, and Nyquist-Johnson, but it is clear from the record that the communications concerned Devendorf's alleged use of clearly inappropriate vulgarity when speaking with these three fire department employees.[3]  *Desrochers* made clear, however, that speech dealing with "'individual personnel disputes and grievances' and that would be of 'no relevance to the public's evaluation of the performance of governmental agencies' is generally not of 'public concern.'"  *Id.* at 710 (quoting *Coszalter v. City of Salem*, 320 F.3d 968, 973 (9th Cir. 2003)).  "To address a matter of public concern, the content of the . . . speech must involve 'issues about which information is needed or appropriate to enable the members of society to make informed decisions about the operation of their government.'"   *Id.* (quoting *McKinley v. City of Eloy*, 705 F.2d 1110, 1113 (9th Cir. 1983)).

Grievances about vulgarity by a supervisor, although clearly legitimate personnel matters, generally do not implicate public concerns.  *Desrochers* explained that "when

---

[3]  The communications that gave rise to the personnel complaints against Devendorf occurred on three occasions.  On August 24, 2010, Devendorf allegedly stated to Laipple: "What are you, a f**king pussy?  You can't leave for three days without going home?"  Doc. 205, ¶ 93.  On August 21, 2010, Devendorf told Stazenski that he should be sure to keep all his receipts from a trip to Oregon or that he "would have to f**k" a specific member of the Fire Department's administrative staff "for every receipt that was missing."  *Id.*, ¶ 98; Doc. 205-2 at 48.  On October 6, 2010, Devendorf allegedly asked Nyquist-Johnson "Do you have a good OB/Gyn?"   When she asked why, Devendorf responded: "Because I have two employees who called in sick because they pulled their uteruses."  Doc. 205, ¶ 105; Doc. 205-5 at 57.

working for the government, saying one's boss is a bully does not necessarily a constitutional case make."  572 F.3d at 713.  The same is true of saying one's boss is vulgar or insensitive:

> The content of the communication must be of broader societal concern. Our focus must be upon whether the public or community is likely to be truly interested in the particular expression, or whether it is more properly viewed as essentially a private grievance.  On the facts of this case, we cannot say that the public would be truly interested that two police sergeants believed their supervisor was a "micro-manager," "autocratic" and "controlling," or even that he dressed them down in front of their colleagues and neighboring police forces.

*Id.* (citations, quotation marks, and brackets omitted).

Nor do the form and context of Vincente's statements to Martinez make them matters of public concern.  Plaintiffs acknowledge that "individual personnel disputes typically do not constitute speech on a matter of public concern," but argue that "collective personnel grievances, raised by unions, may be matters of public concern." Doc. 213 at 2.  Plaintiffs cite *Lambert v. Richard*, 59 F.3d 134, 136 (9th Cir. 1995), for the proposition that speech about collective personnel grievances addresses a matter of public concern, but the facts of *Lambert* are quite distinguishable from this case.  The plaintiff in *Lambert* spoke on behalf of a union – the Santa Ana City Employees Association – at a meeting of the Santa Ana City Council.  *Id*. at 135.  Her speech criticized the management practices of Santa Ana's Library Director.  *Id.*  The court concluded that the speech addressed a matter of public concern because "Lambert spoke as a union representative, not as an individual," and "described departmental problems, not private grievances."  *Id.* at 137.  The court emphasized that "operation of a public library is among the most visible of the functions performed by city governments," and that "[t]he fact that Lambert spoke at a televised city council meeting underlines the public nature of the . . . controversy."  *Id.* at 136-37.

Unlike the speech in *Lambert*, there is no evidence that Vincente's speech was

made in a public forum or otherwise shared with the citizenry at large.  Nor is there evidence that Vincente spoke on behalf of the Union's entire membership.  Although Plaintiffs argue that it was "common sentiment" that Devendorf had trouble interacting appropriately with co-workers, they present no evidence that this trouble amounted to a public controversy akin to the library mismanagement in *Lambert*.  And the fact that these personnel issues arose in an agency affecting public safety does not render them matters of public concern for purposes of a First Amendment retaliation claim. *Desrochers* held that personnel issues in a police department were not matters of public concern.  *Desrochers* explained that "the reality that poor interpersonal relationships amongst coworkers might hamper the work of a government office does not automatically transform speech on such issues into speech on a matter of public concern." *Id.* at 711.[4]

Plaintiffs attempt to suggest a broader purpose in Vincente's communications to Martinez, arguing that he "stood up for the firefighters on the floor and took their concerns to Fire management and even City administration to inform them of the unacceptable work environment Devendorf's behavior was creating."  Doc. 213 at 3.  But the only evidence Plaintiffs cite in support of this assertion are general statements in the deposition of Daniel Bates (Docs. 213 at 3, 214 at 2), and the only specific instances cited by Bates are the vulgarity complaints by Laipple, Stazenski, and Nyquist-Johnson (Doc. 214-9 at 6 (depo. page 66)).[5]

---

[4] Plaintiffs' reliance on *Ellins v. City of Sierra Madre*, 710 F.3d 1049 (9th Cir. 2013), is also unavailing.  The plaintiff in *Ellins* spoke about the police chief's "lack of leadership, wasting of citizens' tax dollars, hypocrisy, expensive paranoia, and damaging inability to conduct her job," all of which led to a no-confidence vote.  *Id.* at 1057. Vincente's communications with Martinez about Devendorf's vulgarity is clearly distinguishable.

[5] Another citation to the Bates deposition includes testimony that Bates and others urged Vincente to "fight this" because he was standing up for Union members. Doc. 214-9 at 8 (depo. Page 105).  Because the complete excerpt of this testimony was not provided by Plaintiffs, the Court cannot determine what "this" refers to, but it appears to refer to a suggestion that Vincente resign.  *Id.*  The cited Bates testimony does identify any specific protected speech related to this incident, and the Court therefore cannot determine that it involved speech on matters of public concern.  *Id.*

As already noted, Plaintiffs also contend that Vincente's 2004 advocacy of a no-confidence vote in Devendorf was speech on a matter of public concern. Assuming, without deciding, that Plaintiffs are correct, Plaintiffs have provided no evidence from which a reasonable jury could find that Vincente's 2004 comments to Defendant Hadley were a substantial motivating factor in any adverse employment action. The only evidence Plaintiffs present in this regard is an alleged statement by Defendant Norwood that Vincente's union activity would have to stop. It is unclear from Plaintiffs' evidence, however, when this statement was made. *See* Doc. 214-11 at 20. Plaintiffs allege that "there were several instances of express opposition to [Vincente]'s protected speech" (Doc. 213 at 7), but Plaintiffs present no such evidence. Plaintiffs do present evidence that Defendant Hadley said in 2004 that she was "going to be a pain" if Vincente and the Union tried to proceed with a no-confidence vote against Devendorf (Doc. 214-10 at 11-12), but Plaintiffs present no evidence showing a connection between Hadley's statement in 2004 and any employment actions taken in December 2010 or January 2011. No reasonable jury could conclude, based on this evidence, that Vincente's 2004 statements about the no-confidence vote were a substantial motivating factor in employment actions taken six or seven years later.

Considering the content, form, and context of Vincente's communication of grievances to Martinez, the Court concludes that Plaintiffs have not presented evidence from which a reasonable jury could find that the speech addressed matters of public concern. The Court also concludes that Plaintiffs have failed to present evidence from which a reasonable jury could find First Amendment retaliation based the 2004 no-confidence vote. Because Plaintiffs have not presented evidence from which a jury could find a violation of a constitutional right, they cannot sustain their claim of a § 1983 violation or defeat qualified immunity. The Court therefore will grant summary judgment in favor of Defendants on Count II of Plaintiffs' complaint. *See Celotex*, 477 U.S. at 323 (summary judgment is appropriate against a party who "fails to make a showing sufficient to establish the existence of an element essential to that party's case,

1   and on which that party will bear the burden of proof at trial.").

2       **B.**    **State Law Claims.**

3           **1.**    **Notice of Claim.**

4         Defendants argue that Plaintiffs cannot show they properly served Defendants

5   with a notice of claim as required by Arizona law. Doc. 204. Plaintiffs argue that

6   Defendants have waived the defense. Doc. 213 at 10.

7         Under Arizona law, persons with "claims against a public entity or a public

8   employee" must "file claims with the person or persons authorized to accept service for

9   the public entity or public employee . . . within one hundred eighty days after the cause of

10   action accrues." A.R.S. § 12-821.01. "[T]he person 'must give notice of the claim to

11   *both* the employee individually and to his employer.'" *Harris v. Cochise Health Sys.*,

12   160 P.3d 223, 230 (Ariz. Ct. App. 2007) (quoting *Crum v. Superior Court*, 922 P.2d 316,

13   317 (Ariz. Ct. App. 1996)) (emphasis in original).

14         This notice of claim requirement is "subject to waiver, estoppel and equitable

15   tolling." *Jones v. Cochise Cnty.*, 187 P.3d 97, 104 (Ariz. Ct. App. 2008) (quoting

16   *Pritchard v. State*, 788 P.2d 1178, 1183 (Ariz. 1990)). Under Arizona law, waiver

17   "should be found when the defendant has 'taken substantial action to litigate the merits of

18   the claim that would not have been necessary had [it] promptly raised the defense.'" *City*

19   *of Phoenix v. Fields*, 201 P.3d 529, 536 (Ariz. 2009) (quoting *Jones*, 187 P.3d at 104).

20         Defendants filed a motion to dismiss this action on February 10, 2012, but they did

21   not raise the notice of claim defense. Doc. 6. More than two years have now passed and

22   the parties have completed extensive discovery, involved the Court in numerous

23   discovery disputes, and filed dispositive motions with thousands of pages of supporting

24   material. The parties clearly have taken substantial action to litigate the merits of this

25   case – action that would not have been necessary had Defendants promptly raised their

26   notice of claim defense. Defendants argue that they have not waived the defense because

27   the bulk of litigation has occurred since October 2013 due to delays caused by Plaintiffs'

28   ongoing bankruptcy case. The Court does not agree. Plaintiffs do not dispute that they

failed to serve notices of claim on the individual Defendants, and none of the litigation against these Defendants on the state claims would have been necessary had Defendants timely raised this defense.  Defendants have waived the notice of claim defense.

## 2. Defamation.

Defendants argue that they are entitled to summary judgment on Plaintiffs' defamation claim because Vincente is a public official or public figure and has failed to present evidence of actual malice.  Doc. 204 at 16.  Plaintiffs dispute that Vincente is a public official and contend, therefore, that no showing of actual malice is required.  Doc. 213 at 12.  The Court concludes that Vincente is a public official for purposes of his defamation claim, but also that genuine issues of material fact exist as to whether Plaintiffs can show actual malice.

Public officials are "those among the hierarchy of government employees who have, or appear to the public to have, substantial responsibility for or control over the conduct of government affairs."  *Rosenblatt v. Baer*, 383 U.S. 75, 85 (1966); *see also Lewis v. Oliver*, 873 P.2d 668, 674 (Ariz. Ct. App. 1993).  This is an Arizona defamation claim, and Arizona courts have held that police officers, public school teachers, and FAA inspectors are public officials.  *See Lewis*, 873 P.2d at 674 (FAA inspector as public official); *Turner v. Devlin*, 848 P.2d 286 (Ariz. 1993) (police officer as public official); *Godbehere v. Phoenix Newspapers, Inc.*, 783 P.2d 781 (Ariz. 1989) (same); *Rosales v. City of Eloy*, 593 P.2d 688 (Ariz. Ct. App. 1979) (same); *Sewell v. Brookbank*, 581 P.2d 267 (Ariz. Ct. App. 1978) (public school teacher as public official).  Defendants also present several cases where courts have held that both fire captains and union officials are public officials.  Doc. 204 at 16 (citing *Castello v. City of Seattle*, No. C10-1457MJP, 2010 WL 4857022, at *11 (W.D. Wash. Nov. 22, 2010) (holding that a paramedic/firefighter was a public official); *Miller v. Minority Bhd. of Fire Prot.*, 463 N.W.2d 690, 694 (Wis. Ct. App. 1990) (holding that a fire captain is public official); *Cox v. Galazin*, 460 F. Supp. 2d 380, 388 (D. Conn. 2006) (finding that a union official was a limited public figure)).

1      Defendants have provided evidence from which a reasonable jury could conclude

2    that Vincente appeared to the public to have substantial responsibility for or control over

3    government affairs.   This includes evidence that Vincente "attends 5-6 community

4    functions per year, provides community education, and is featured in local news articles."

5    Docs. 204 at 2; 205-1 at 44-45, 58, 205-9 at 27.  It also includes evidence that Vincente,

6    in his union role, "attends publicly-held meetings, speaks at public events, and is featured

7    in local news articles on association and political issues."  Docs. 204 at 3; 205-1 at 74-75,

8    78, 205-9 at 27-28.  Although Arizona courts have not squarely addressed whether a fire

9    captain is a public official for purposes of defamation, it is likely they would answer that

10   question in the affirmative given their conclusions that police officers, public school

11   teachers, and FAA inspectors are public officials.

12      Turning to the question of actual malice, Defendants contend that "Plaintiff must

13   present evidence from which a reasonable jury could find clear and convincing proof of

14   actual malice."  Doc. 204 at 16 (citing *Anderson*, 477 U.S. at 257).  Plaintiffs present

15   evidence that two days before Norwood met with Mrs. Vincente, he and the other

16   Defendants received a legal opinion that the practice of paying for trades was lawful.

17   Docs. 213 at 17; 214-5 at 31, 36.  More specifically, Plaintiffs' evidence shows that

18   Jacobsen told the City's internal investigator that "City and PFD administration knew that

19   pay for trades was not illegal" on January 5, 2011 (Doc. 215-5 at 31), and that Jacobsen,

20   Hadley, Martinez, and Norwood had a meeting on the same day (*id.* at 37).  This is

21   evidence from which a reasonable jury could find clear and convincing proof that

22   Norwood knew that his statement to Mrs. Vincente on January 7, 2011 – that Vincente

23   may have engaged in criminal activity – was false or made with reckless disregard.  *New*

24   *York Times v. Sullivan*, 376 U.S. 254, 279-80 (1964).  The Court therefore cannot grant

25   summary judgment for Defendants on this basis.

26          **3.      Injurious Falsehood.**

27      The parties agree that Arizona adopts the requirements for injurious falsehood set

28   forth in the Restatement (Second) of Torts § 623A – that an individual who publishes a

false statement harmful to the interests of another is subject to liability for resulting pecuniary loss if (1) he intends for publication of the statement to result in harm to the interests of the other having a pecuniary value, or either recognizes or should recognize that it is likely to do so, and (2) he knows the statement is false or acts in reckless disregard of its truth or falsity.  *See W. Techs., Inc. v. Svedrup & Parcel, Inc.*, 739 P.2d 1318, 1327 (Ariz. Ct. App. 1986).

Defendants argue that there is no evidence that Plaintiffs sustained any pecuniary loss as a result of any statements made by Defendants.  Doc. 204 at 18.  In response, Plaintiffs point to a portion of Vincente's deposition where he testified that he "believed" his business was hurt by Defendants' statements that he had engaged in criminal activity.  Doc. 214-1 at 23.  This imprecise belief, standing alone, could not support a jury finding of pecuniary loss.

Vincente also testified that "a lot of times over the course of years" a local contractor named Steve Blair would recommend Vincente to do landscaping, but that "he can't think of a time since all this has happened that [Vincente has] been recommended by him to do landscaping."  *Id.*  Plaintiffs present no evidence on the frequency of referrals from Blair before or after Defendants made their allegedly false statements, nor that Steve Blair is still in the business of making referrals or was told by anyone that Vincente had engaged in criminal activity.

Plaintiffs have not presented evidence from which a reasonable jury could find pecuniary loss.  The Court will enter summary judgment on this claim.

**C.    Injunctive Relief.**

Count Five of Plaintiffs' Third Amended Complaint asserts that Vincente entered the DROP program under duress and asks the Court to order the Board to "rescind [his] forced election of the DROP program[.]"  Doc. 89, ¶¶ 88-92.  Defendants' motion for summary judgment cites evidence showing that Vincente voluntarily signed a waiver when he entered the DROP, and later testified that he "had free will to make that choice[.]"  Doc. 204 at 8.  Defendants present the "Memorandum of Understanding and

Agreement" signed by Vincente on January 25, 2011, wherein Vincente initialed the following statements: (1) "I have not been subject to any pressure, coercion, intimidation or threats by my employer or the Local Board or any of their agents in connection with my election to participate in the DROP," and (2) "I release my employer, the Local Board and the Fund Manager from any and all claims based on my election to participate in the DROP and my agreement to retire and terminate my employment with my employer upon completion of my participation in the DROP." *See* Doc. 205-4 at 60-61.

Defendants' motion also cites Arizona case law concerning the avoidance of a contract on grounds of duress (Doc. 204 at 14), and substantial evidence that Vincente voluntarily signed the DROP documents, released claims related to the DROP program, and confirmed that he was not under threat (*id.* at 15). Although this discussion appears in the section of the motion dealing with the adverse action element of Plaintiffs' First Amendment claim, it specifically argues that Plaintiffs' "own evidence reveals the absence of duress, and any damage, *or injunctive relief*, claim related to the DROP must be dismissed." *Id.* (emphasis added). The conclusion of Defendant's motion then asserts:

> As to Plaintiff's claim for damages or injunctive relief based on his entry into the DROP, Plaintiff entered into a specific written agreement waiving and releasing such claims, and covenanting not to sue the City of Prescott, the Local Board, and their employees. Under the facts present, Plaintiff was not under duress such that he is relieved of the consequences of his agreement.

Doc. 204 at 18.

Plaintiffs failed to respond to these arguments regarding the DROP program. Indeed, their response to the summary judgment motion does not even mention the DROP program until the penultimate sentence, which merely asserts: "As Plaintiff entered into the DROP program under the threat of possible criminal prosecution and unwarranted disciplinary threats, Plaintiff was under sufficient duress at the time, worried

about [his] future financial security."  Doc. 213 at 18.  This sentence contains no citation to evidence, and Plaintiffs' statement of facts never even mentions the DROP program.  *See* Doc. 214.

Given their complete lack of briefing and factual support, Plaintiffs have failed to raise a genuine issue of material fact on whether Vincente entered the DROP program under duress.  The Court accordingly will grant summary judgment on Count 5.

**IV.  Other Motions.**

**A.  Plaintiffs' Motion for Sanctions.**

Although this motion is styled as a motion for partial summary judgment, it seeks sanctions, apparently under the Court's inherent power, for "Defendants' failure to disclose and intentional spoliation of potentially relevant email communications."  Doc. 206 at 1.  Plaintiffs rely on the standard articulated in *Surowiec v. Capital Title Agency*, 790 F. Supp. 2d 997, 1005 (D. Ariz. 2011), which states that a party seeking sanctions for spoliation of evidence must prove the following elements: (1) the party having control over the evidence had an obligation to preserve it when it was destroyed or altered; (2) the destruction or loss was accompanied by a culpable state of mind; and (3) the evidence that was destroyed or altered was relevant to the claims or defenses of the party that sought discovery of the spoliated evidence.

A duty to preserve arises when a party knows or should know that certain evidence is relevant to pending or future litigation.  *Id.*  Defendants were on such notice when they received Plaintiffs' Notice to Preserve Information and Data on February 8, 2011, and therefore had a duty to preserve.  Doc. 206 at 8.

Plaintiffs' motion alleges that Defendants "failed to preserve an unknown number of potentially relevant emails."  *Id.* at 8.  Plaintiffs assert that some Defendants searched their own computers for relevant emails rather than having someone from the City's IT department conduct the search.  *Id.* at 9.  They also argue that the IT Department "never received notification of the preservation request and was never asked to preserve ESI for this matter," and that this conduct falls short of Defendants' duty to preserve.  *Id.* at 10.

1    Aside from these general assertions, Plaintiff's motion identifies nine specific categories

2    of allegedly lost evidence.  *Id*. at 3-7.  The Court will address each category.[6]

3         1.    Plaintiffs allege that Defendant Jacobsen failed to preserve notes she made

4    during a meeting with Vincente on December 22, 2010, and January 3, 2011.  Defendants

5    respond that these notes have not been destroyed, but have been withheld under the

6    attorney-client privilege.   Because Plaintiffs fail to contradict or even address this

7    assertion in their reply (Doc. 225), this category provides no basis for sanctions.

8         2.    Plaintiffs complain that portions of Defendant Jacobsen's Outlook

9    Calendars are redacted.  Defendants explain that the redactions reflect attorney-client

10   communications and personal information.  Because Plaintiffs fail to contradict or even

11   address this assertion in their reply (*id.*), this category provides no basis for sanctions.

12        3.    Plaintiffs complain that Defendants did not produce parts of Devendorf's

13   disciplinary file.  In later briefing, the parties focus on a November 30, 2010 disciplinary

14   memorandum that was not produced by the City but was produced by Devendorf.  One of

15   the factors the Court must consider is whether the evidence at issue was relevant to the

16   claims or defenses of the party that sought discovery.  *Surowiec*, 790 F. Supp. 2d at 1005.

17   Plaintiffs do not explain the relevancy of this memorandum.  Although Plaintiffs claim

18   Vincente suffered retaliation for his communication of complaints against Devendorf, the

19   fact that those communications occurred has not been disputed by Defendants, and

20   Plaintiffs do not explain how the actual discipline Devendorf received is relevant to their

21   retaliation claim.    More importantly, Plaintiffs obtained the memorandum from

22   Devendorf and therefore have not been prejudiced by the City's failure to produce it.  The

23   memorandum does bear on Plaintiffs' general claim of non-preservation, but given the

24   complete lack of prejudice with respect to the memorandum, the Court cannot conclude

25   that it provides a basis for sanctions.  *Rimkus Consulting Grp., Inc. v. Cammarata*, 688 F.

26   Supp. 2d 598, 613 (S.D. Tex. 2010) ("Determining whether sanctions are warranted and,

27

28       [6] Plaintiffs' motion actually contains ten categories, but number six refers to documents addressed in items four and five and therefore will not be addressed separately in this order.  *See* Doc. 206 at 4.

1    if so, what they should include, requires a court to consider both the spoliating party's

2    culpability and the level of prejudice to the party seeking discovery.")

3         4.    Plaintiffs complain that Defendants did not produce a December 29, 2008

4    email from Martinez to Lucas, a copy of which was eventually obtained from Lucas.

5    Defendants respond that this email was outside the date range in Plaintiffs' document

6    production request and therefore was not produced.  Because Plaintiffs fail to contradict

7    or even address this assertion in their reply (Doc. 225), this category provides no basis for

8    sanctions.[7]

9         5.    Plaintiffs complain that Defendants did not produce a December 7, 2010

10   email from Martinez to Lucas that mentions discipline of Devendorf.  Plaintiffs state that

11   they obtained the email from another source, but do not say where.  Defendants do not

12   dispute that they failed to produce the email, but assert that it is of marginal relevance.

13   As noted above, Plaintiffs do not explain how the actual discipline Devendorf received is

14   relevant to their retaliation claim, nor can they claim prejudice from failure to produce an

15   email they received elsewhere in discovery.  The email, like the memorandum discussed

16   above, bears on Plaintiffs' general claim of non-preservation, but given the complete lack

17   of prejudice with respect to the email, the Court cannot conclude that it provides a basis

18   for sanctions.

19        6.    Plaintiffs complain that Defendants have not produced portions of

20   Devendorf's personnel file.  Defendants respond that the file exists and Plaintiffs'

21   counsel was invited to review the entire file at defense counsel's office but failed to do

22   so.  Plaintiffs do not address this issue in their reply (Doc. 225), but their motion states

23   that defense counsel "has indicated that Plaintiffs' counsel may come to his office to

24   inspect the complete file, but he will not deliver it to Plaintiffs" (Doc. 206 at 4).  Not only

25   _____

26        [7] This email contains a suggestion from Martinez that Lucas "please delete" the
     email.  This suggestion is troubling, but the Court does not find it indicative of a broader
     effort to delete relevant emails.  The email in question includes a David Letterman-type

27   "top ten" list of statements people would make when they learned Ms. Nyquist-Johnson
     had been transferred.  Doc. 206-4 at 44.  The list includes inappropriate, off-color humor.
     It appears likely to the Court that Martinez suggested the email be deleted because it

28   contained inappropriate humor, not because of some broader intent to hide evidence.

does Rule 34(b)(2)(B) permit a party to make documents available for the other side's inspection, but defense counsel's failure to "deliver" documents to the office of Plaintiffs' counsel is an utterly insufficient basis for seeking spoliation sanctions.

7.      Plaintiffs complain that Defendants produced a February 24, 2011 email to Plaintiffs late, after Plaintiffs obtained it from Lucas.  Because the email was produced by the City, it clearly was not lost or destroyed and therefore provides no basis for spoliation sanctions.  The late production is concerning, but Plaintiffs seek sanctions for spoliation, not for other discovery conduct.

8.      Defendants produced to Plaintiffs a February 7, 2011 email from Jacobsen to Martinez with the following subject line: "Out of Office: Disciplinary Action Against J.P. Vincente."  Doc. 206-4.  The email states that Jacobsen is out of the office and unable to respond.  Plaintiffs complain that the email to which this email responded has never been produced.  Defendants respond that there is no evidence of any other email, a response the Court finds altogether unpersuasive.  The February 7 email is itself clear evidence that another email existed and prompted the "Out of Office" reply, and the subject line makes clear that the other email was potentially highly relevant as it concerned Vincente and his discipline, a matter directly relevant to the claims in this case.  Defendants' failure to preserve and produce the email to which this email responded raises a very legitimate spoliation concern that will be addressed below.

9.      Plaintiffs complain that transcripts of interviews conducted by a City investigator are redacted.  Defendants respond that the redacted materials were attorney-client communications.  Because Plaintiffs fail to contradict or even address this assertion in their reply (Doc. 225), this category provides no basis for sanctions.

In general, Plaintiffs have presented evidence that Defendants' document preservation efforts were inadequate.  Although the City notified key personnel to preserve relevant evidence within a month of receiving Plaintiffs' preservation demand letter, and notified others to take preservation measures within a week of the filing of this lawsuit, the City had an automatic procedure for eliminating deleted emails after 30 days

and never notified its IT department to suspend this practice.  Nor did the City instruct its IT department to assist key individuals in collecting and preserving relevant emails, or provide assistance in doing so from the legal department.  These preservation efforts were plainly deficient.  The fact that they resulted in lost emails is shown not only by the failure to produce the email that prompted the February 7, 2011 "Out of Office" reply, but also by the City's failure to produce the December 7, 2010 email from Martinez to Lucas.

Plaintiffs seek the sanction of striking Defendants' answer, an action that would effectively result in a default judgment being entered.  Plaintiffs fail to recognize, however, that a finding of bad faith "is a prerequisite" to case-dispositive sanctions such as default judgment or "dismissing a case pursuant to a court's inherent power."  *Leon v. IDX Sys. Corp.*, 464 F.3d 951, 961 (9th Cir. 2006).  Plaintiffs do not discuss the bad faith standard nor show how it has been satisfied in this case.  For this reason, the Court will not impose the requested sanction of default judgment.[8]

The Court denies Plaintiffs' sanctions request for an additional reason.  As discussed above, Plaintiffs have identified only one email that ultimately was lost as a result of Defendants' inadequate preservation actions.  It certainly is possible that other relevant emails were lost, but Plaintiffs have failed to present evidence of that fact, and every other item of lost information identified in their motion was either withheld on

---

[8] In *Surowiec*, a case that concerned loss of electronically stored information ("ESI"), this Court suggested that the sanction of an adverse inference jury instruction could be imposed upon a showing of gross negligence.  790 F. Supp. 2d at 1004-09.  Plaintiffs do not address the gross negligence standard of culpability either.  Having read many more spoliation cases since *Surowiec* was decided, the Court now tends to think that bad faith should be required before the severe sanctions of adverse inference instructions, dismissal, or default are imposed in ESI cases.  *See, e.g., Aramburu v. Boeing Co.*, 112 F.3d 1398, 1407 (10th Cir. 1997) (bad faith required for adverse inference jury instruction); *Rimkus Consulting Grp.*, 688 F. Supp. 2d at 614 ("[T]he severe sanctions of granting default judgment, striking pleadings, or giving adverse inference instructions may not be imposed unless there is evidence of 'bad faith.'"); *see also Chambers v. NASCO, Inc.*, 501 U.S. 32, 46 (1991) (recognizing a federal court's inherent power to impose substantial attorneys' fees as a sanction for "bad-faith conduct").  The Court need not decide that issue here, because Plaintiffs have not sought an adverse inference instruction.  Moreover, given the Court's summary judgment ruling, no claims remain to which such an instruction would be relevant.

privilege grounds, not inspected at defense counsel's office, or obtained from other defense-related sources. The email that was not preserved apparently was sent in February of 2011 and concerned potential disciplinary actions against Vincente. Plaintiffs have collected and presented much evidence concerning disciplinary actions threatened by Defendants in this time period with regard to Vincente's pay-for-trade practices, and the Court cannot conclude that the loss of one email concerning those actions constitutes significant prejudice, particularly given the lack of protected speech for purposes of Plaintiffs' First Amendment retaliation claim and Plaintiffs failure to present any evidence in support of their claim for injunctive relief on the DROP program. Because prejudice clearly is part of the calculus for assessing sanctions, *Rimkus Consulting Grp.*, 688 F. Supp. 2d at 613, the Court concludes that Plaintiffs have not shown they are entitled to substantial sanctions, particularly the sanction of default judgment.

Plaintiffs also ask for an award of attorneys' fees and costs. The Court will address this request below.[9]

### B.    Defendants' Cross Motion for Sanctions.

In response to Plaintiffs' motion, Defendants filed a cross-motion for sanctions. Defendants seek sanctions under Rule 37 and the Court's inherent power. *See Leon*, 464 F.3d at 958.

### 1.    Requests for Admission.

Defendants argue that Plaintiffs failed to respond to December 19, 2013 requests for admission. Doc. 216 at 13. Plaintiffs counter that they did in fact respond. Doc. 226 at 3. A review of the parties' submissions indicates that Plaintiffs did respond to the requests for admission and Defendants were not satisfied with Plaintiffs' response.

---

[9] Plaintiffs' motion ask the Court to conduct an *in camera* review of the redacted interview transcripts created by the City's investigator. Doc. 206 at 7. But Plaintiffs provide no rebuttal to Defendants' assertion that the redactions were made only for attorney-client communications. In addition, Plaintiffs' motion was filed more than a month after discovery was completed. The Court's Case Management Order states that "[a]bsent extraordinary circumstances, the Court will not entertain fact discovery disputes after the deadline for completion of fact discovery[.]" Doc. 20.

Doc. 217, ¶¶ 94-101.   The parties reached an agreement that Vincente would review interview transcripts and respond to the requests by marking the transcripts and submitted them to defense counsel by March 7, 2014.  *Id.*  Plaintiffs have submitted a letter dated March 7, indicating that transcripts were sent on that date.  Doc. 226-2.

The Court will not impose sanctions on this issue because it appears Plaintiffs responded within the time allowed by the parties' agreement.  In addition, although Defendants argue that the responses were inadequate, the Court has difficulty with the discovery requests at issue.  Defendants asked Vincente to verify the accuracy of interview transcripts created by the City's investigator.  But Vincente did not have a recording of the interviews, and Defendants do not say they offered to provide one.

## 2.   Business Documents.

Defendants assert that Plaintiffs have "failed to provide any calendars or financial information related to [Vincente's hunting business]."  Doc. 216 at 14.  They argue that Vincente "has testified to the existence of documents that he has steadfastly refused to produce[.]"  *Id.* at 15.  Defendants claim that Plaintiffs were ordered by the Court to produce these documents and have failed to do so.  Doc. 241 at 6.  That order was entered on January 22, 2014.  Doc. 173.

Plaintiffs respond that they have "provided all information in their possession which constituted contracts for guide trips performed during the relevant time period."  Doc. 226 at 4.  They contend that "[t]hese are the only records Plaintiffs had in their possession after performing a thorough search of the entire collection of business files and computer."  *Id.*  Plaintiffs acknowledge that they were not ordered to produce "contracts for guide trips," but instead were ordered to produce "all documentation in their possession related to when [Vincente] guided hunts during the calendar years 2008, 2009, and 2010 and what his income has been for work during those years."  *Id.*

Defendants argue in reply that Vincente stated in 2011 that he was in possession of calendars and logs for his hunting guide business, and, during a 2013 deposition, he specifically described contracts with hunting guides and IRS 1099 forms.  Doc. 241 at 5.

Defendants argue that Plaintiffs produced only "seven pages of documents which were merely redacted, unsigned and undated letters between [Vincente's business] and actual or contemplated clients." *Id.* This evidence does establish a likelihood that additional records exist for Vincente's outside businesses.

Defendants request an adverse inference jury instruction as well as an award of attorneys' fees and costs incurred pursuing their production. Doc. 216 at 15. Given the Court's summary judgment ruling, the only claim that remains in this case is the defamation claim based on a statement to Vincente's wife that his actions likely were illegal. Although the business records would have been relevant to claims that have been eliminated by summary judgment, they do not appear to be relevant to the limited defamation claim that remains. The Court therefore need not wrestle with the question of whether Defendants have shown the level of culpability needed for an adverse inference instruction. The Court will address the attorneys' fees request below.

### 3. Emails.

Defendants argue that Vincente failed to identify an email address that he used to communicate about issues involving his employment. Doc. 216 at 15. They state that "there were emails discovered through other sources that Vincente should have located and produced," and that Defendants received a supplemental disclosure of emails on February 24, 2014, "though Plaintiffs' counsel represented to the Court on February 20, 2014 that all relevant emails in Plaintiffs' possession had been located and produced[.]" *Id.* Defendants ask the court to "infer that Plaintiffs have destroyed or lost emails relevant to this matter, and have acted intentionally or in bad faith." *Id.*

The Court cannot infer that Plaintiffs destroyed emails because they produced emails after the discovery deadline. Nor do the emails appear to relate to any claim that remains in this case. The request for attorneys' fees is discussed below.

### 4. Digital Recorder.

Defendants apparently requested access to a digital recorder used by Vincente during a meeting with Defendant Hadley and were told during the discovery period that

Plaintiffs did not have it.  Doc. 216 at 17.  The recorder was ultimately produced on April 14, 2014, after the deadline for dispositive motions.  *Id.*   The recorder was blank when it was received, and Defendants argue they have been prejudiced by not having the opportunity to retain an expert to determine whether any files had been deleted.  *Id.*

Plaintiffs argue that the City's investigator, Keith Sobraske, was given a chance to examine the recorder in August 2011, a fact Defendants do not mention in their motion. Doc. 226 at 9; Doc. 226-5 at 3.  Sobraske found that the recorder had only two audio files, neither of which was more than five seconds long.  Doc. 226 at 9.  One file had no sound and the other was a recording of a male voice repeatedly saying "testing."  *Id.*

Defendants note that Vincente told Sobraske that he had recorded "some" conversations with City employees (Doc. 217, ¶ 152), and that he "felt fairly comfortable" that he had recorded a conversation with Laurie Hadley on January 20, 2011 (Doc. 241 at 10).  Sobraske's first request for the recordings of these conversations was made on April 21, 2011.  Doc. 217, ¶ 153.  Plaintiffs offer no explanation for why they did not turn over the recorder to Sobraske until August 2011.  Defendants argue that it is likely Vincente had a recording of the January 20, 2011 meeting with Hadley that he later deleted, because his Administrative Grievance filed on February 23, 2011 "contains no less than fifteen specific quotes" from the meeting.  Doc. 216 at 16.

The Court is troubled by the conduct of both parties here.  It certainly is possible that Vincente recorded conversations with City employees and that those recordings were lost or deleted.  His refusal to provide the recorder to Sobraske for months is troubling. But Defendants knew from Sobraske, when this action was commenced, that the recorder existed and that there was nothing of significance on it.  If they truly wanted "to conduct a forensic analysis by an appropriate expert to determine if files had been erased or modified" (Doc. 241 at 10), they should have raised this issue with Plaintiffs or the Court prior to the November 29, 2013 deadline for expert disclosures.  The Court's Case Management Order states that, "[a]bsent extraordinary circumstances, the Court . . . will not entertain expert discovery disputes after the deadline for completion of expert

1    discovery."  Doc. 20.  Defendants have not identified a specific request for the recorder

2    by their counsel that occurred before December 3, 2013.[10]   Accordingly, although

3    Plaintiffs' handling of the recorder was less than desirable, it is difficult to accept

4    Defendants' claims that they were prejudiced given their failure to raise the issue until

5    late in the discovery period.  Defendants' request for sanctions on this matter is denied.

6              **C.      Motion to Compel.**

7              Plaintiffs have moved to compel the disclosure of unredacted versions of two

8    litigation hold letters sent by the City to its employees.  Doc. 244.  Defendants have

9    disclosed redacted versions.  Doc. 233-1.  Both parties agree the letters are not attorney-

10   client communications.  Docs. 244 at 4, 248 at 5.  The real reason they have not been

11   disclosed is that counsel were unable to reach an agreement on whether disclosure of the

12   letters in unredacted form would be argued as a waiver of attorney-client privilege.  This

13   is a silly dispute.  Because Defendants appear to concede the letters are not privileged,

14   Defendants are ordered to produce the unredacted versions.  Defendants do not waive

15   attorney-client privilege by producing the documents.

16             **D.      Remaining Motions.**

17             The Court will deny as moot all remaining motions.  These motions relate to

18   Plaintiffs' so-called motion for partial summary judgment, which the Court has denied.

19             **E.      Requests for Attorneys' Fees.**

20             Although the Court has denied the requests for more severe sanctions, the Court

21   finds that both parties have engaged in inadequate preservation.  The Court does not

22   doubt that attorneys' fees were incurred on both sides searching for information that

23   should have been produced by the other side.  Determining the proper amount of such

24   fees would require a major effort by the Court and the parties.  In addition, fee awards

25   might turn out to be mutually offsetting, resulting in little reparation or deterrence.

26             The Court concludes that it should withhold a decision on the requests for fees

27   

28             [10] Defendants argue that a June 29, 2012 request for production "clearly covered"
     the recorder (Doc. 216 at 17), but the Court does not agree.  That document did not
     specifically request that Plaintiffs produce the recorder.  *See* Doc. 217-7 at 20-25.

                                            - 24 -

1 until after trial.  If the parties seek to pursue their requests at that time, the Court can
2 decide, with the benefit of knowledge gained during the trial, how best to litigate the fees
3 issues and the proper awards for each side.

4        **F.     Motions for Reconsideration.**

5        Given the litigious history of this case, the parties may consider filing motions for
6 reconsideration.  The Court reminds the parties that motions for reconsideration are
7 disfavored and should be granted only in rare circumstances.  *See Stetter v. Blackpool*,
8 No. CV 09-1071-PHX-DGC, 2009 WL 3348522, at *1 (D. Ariz. Oct. 15, 2009).   A
9 motion for reconsideration will be denied absent a showing of manifest error or new facts
10 or legal authority that could not have been brought to the Court's attention earlier with
11 reasonable diligence.  LRCiv 7.2(g)(1); *see Carroll v. Nakatani*, 342 F.3d 934, 945 (9th
12 Cir. 2003).  Mere disagreement with an order is an insufficient basis for reconsideration.
13 *See Ross v. Arpaio*, No. CV 05-4177-PHX-MHM, 2008 WL 1776502, at *2 (D.
14 Ariz. 2008).  Nor should reconsideration be used to ask the Court to rethink its analysis.
15 *See N.W. Acceptance Corp. v. Lynnwood Equip., Inc.*, 841 F.2d 918, 925-26 (9th
16 Cir. 1988).

17        If any party elects to file a motion for reconsideration in light of these standards,
18 the motion should not exceed ten pages in length and no response or reply will be filed
19 without a request from the Court.

20        **IT IS ORDERED:**

21        1.      Defendants' motion for summary judgment (Doc. 204) is **granted in part**
22                and **denied in part** as set forth above.

23        2.      Plaintiffs' motion for partial summary judgment (Doc. 206) is **denied**.

24        3.      Defendants' cross motion for sanctions (Doc. 216) is **denied**.

25        4.      Plaintiffs' motion to compel disclosure (Doc. 244) is **granted**.

26        5.      All other pending motions (Docs. 236, 242, 243) are **denied as moot**.

27        6.      The Court will set a final pretrial conference by separate order.  Given the
28                scaled-down nature of this case, each side will be limited to five motions in

limine, not to exceed three pages each.

Dated this 13th day of August, 2014.

_____
David G. Campbell
United States District Judge